## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.: 5:24-cr-00152 |
| Plaintiff, | ) | |
| | ) | JUDGE DAVID RUIZ |
| vs. | ) | |
| | ) | DEFENDANT BRANDON E. |
| BRANDON E. CRAWFORD, | ) | CRAWFORD SENTENCING |
| Defendant. | ) | MEMORANDUM |
| | ) | |

Now comes the Defendant, BRANDON CRAWFORD, by and through counsel, and

hereby submits the following sentencing memorandum in the above-captioned matter.

Respectfully Submitted,

/s/Seneca Konturas
Seneca Konturas (Ohio Bar#0095328)
PO Box 13358
Fairlawn, Ohio 44334
Tel. (330)552-7117
Fax (330)382-3052
Email: seneca@sk.legal
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2025, a copy of the foregoing Motion was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's system.

/s/Seneca Konturas
Seneca Konturas (Ohio Bar#0095328)

<u>**MEMORANDUM**</u>

### I.  Mr. Crawford's History and Characteristics

Mr. Crawford born on August 11, 2000, in Maumee, Ohio to Matthew Crawford and Lysa Crawford. Presentence Report "PSR" ¶37.  He graduated high school in 2019 and is presently single without children. ¶41, 50. His parents divorced when he was 10 years old. ¶37. His father presently resides in Bowling Green, Ohio, working as a delivery driver for Volvo, and his mother lives in Copley, Ohio, working as a DoorDash driver. ¶37.  Mr. Crawford's relationship is close with his father, but "shaky" with his mother. ¶37. Mr. Crawford's 29-year-old sister, with whom he has a strong relationship, lives in Fairlawn, Ohio. ¶37.

Mr. Crawford is a lifelong resident of the Akron, Ohio, area. ¶38. He had a difficult childhood as his father was a heavy drinker who suffered from severe epilepsy and memory issues, including forgetting who his children were. ¶38, 43. When Mr. Crawford was 10 years old, his father had brain surgery. ¶38. Shortly after, his parents divorced and his father became scarcely involved in his upbringing as Mr. Crawford primarily lived with his mother and sister. ¶38.

Soon after their divorce, his mother started a new relationship and would leave Mr. Crawford and his sister alone for weeks at a time without anyone to care for them as children. ¶39. The family struggled financially – their utilities would often be shut off and vehicles were repossessed. ¶39. Mr. Crawford's sister was in high school at the time and would steal food from convenience stores to help feed them during these periods. ¶39, 43. Additionally, following the sexual assault/abuse of his sister at age 12 by a 17-year-old boy, Mr. Crawford had to testify in a court hearing about how she was abused in their home. ¶43. Neither Mr. Crawford nor his sister ever received counseling. ¶43.

Through high school, Mr. Crawford would abuse alcohol daily, eventually engaging in Alcoholics Anonymous at age 19. ¶48. At age 16, Mr. Crawford began a sexual relationship with an older, adult female who was 25 years old at the time. ¶40. She was his supervisor at Bob Evan's where he worked. ¶40. She would buy him alcohol and they would get physical. ¶40. The relationship lasted approximately 3 months. ¶40. In retrospect, Mr. Crawford now sees that it was not an appropriate relationship. ¶40.

During his teenage years, Mr. Crawford did not have any parental boundaries or role models. ¶39. He has been suffering from anxiety and depression since he was a young child. ¶45. He never received mental health treatment for the neglect suffered from his parents. ¶45. All of this was recently confirmed during a mental health evaluation conducted in May, 2024, at Summit Psychological Associates in Akron, Ohio, where he was diagnosed with anxiety, depression, borderline personality disorder, and antisocial personality disorder.

Since receiving his mental health evaluation, Mr. Crawford has been regularly engaging in weekly therapy sessions and is progressing in his treatment goals. ¶49. He has completed a 26-week "New Foundations" substance abuse treatment program. ¶49. Further, Mr. Crawford acknowledges that he is suffering from unaddressed trauma from his childhood and intends to continue with treatment while in the Bureau of Prisons and beyond. ¶46.

Mr. Crawford has taken full responsibility for his behavior and shown genuine remorse for the impact his actions have had on the victims. ¶12. As evidenced by his engagement with mental health services, general compliance while on pretrial release, and the substance of the attached letters of support (Exhibit A), Mr. Crawford has shown that he is taking this matter seriously and is supported by numerous individuals in the community who are not only providing lip service to Mr. Crawford's character, but who have opened their homes and businesses to help him.

## II. The Court must be informed of all factors prior to sentencing.

Congress has conferred on the United States Courts the responsibility to sentence both fairly and consistently.  Pursuant to 18 U.S.C. § 3661, "a court of the United States may receive and consider for the purpose of imposing an appropriate sentence" all information regarding a criminal defendant with "no limitation."  Another statutory goal of federal sentencing is the need to avoid sentencing disparity. 18 U.S.C. § 3553(a)(6).

### Concerns with the Application of U.S.S.G. 2G2.2

Mr. Crawford objects to the enhancements in the Presentence Report at paragraphs 16 through 20 and the adjusted level they create.  Mr. Crawford invites this court to consider the concurrence and dissenting opinions of *U.S. v. Walters*, 775 F.3d 778 (6th Cir. 2015).  Judge White in her concurring opinion stated:

> HELENE N. WHITE, Circuit Judge, concurring.  As the dissent points out, the guidelines applicable to convictions under the Protect Act do not reflect the considered judgement of the Sentencing Commission, and in this regard differ from other Sentencing Guidelines.  To be sure, the Guidelines are not binding and judges are free to depart and vary from them.  But many judges are hesitant to second guess the Commission's judgement due to the presumed experience, expertise, and breadth of information possessed by the commission.  The appropriate judicial response in situations such as this one is not for appellate courts to reduce Guidelines sentences as a matter of course, but rather, for sentencing judges to recognize that Guidelines based on the Protect Act should be carefully scrutinized. Unfortunately, as the dissent observes, Walters' counsel did not bring to the district court's attention, or argue on appeal, that the Commission considers the sentence recommended here to be excessive. In the context of a sentencing proceeding in a child pornography case, competent counsel should be expected to bring to the district court's attention that the Guidelines do not, as in other contexts, reflect the presumed superior expertise and breadth of information of the Commission, and in fact are contrary to the Commission's considered judgment. That, however, is a matter Walters must properly raise in a petition under 28 U.S.C. § 2255.

Judge Merritt in dissent also noted that the Sentencing Commission itself conducted an extensive study and issued a three hundred and fifty (350) page report in 2012. ["Child Porn Report"].  The Child Porn Report asks Congress to remove the harsh Protect Act provision that

ordered the Sentencing Commission in 2003 to write guidelines recommending to Judges the imposition of Sentences such as the fifteen (15) plus year sentence in this case.  The Child Porn Report is based in part on the refusal of a sizeable majority of Judges to follow the guidelines, and the opinion of experts in the field, including, psychologists, medical experts, and legal scholars who have studied the problem.  The Commission study arrived at the conclusion that the present child pornography guidelines have no "rational basis", are "outmoded" do not "distinguish adequately among offenders based on their degrees of culpability," and have "enhancements," like the ones in this case, that are "outmoded and disproportionate."  In the Child Porn Report, the Commission further noted that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that was not widely circulated." *Id.* at 6.  In sum, the Commission found that while the purpose of sentencing enhancements was "originally intended to provide additional proportional punishment for aggravating conduct, [they] now routinely apply to the vast majority of offenders" *Id*. at xi.

In addressing the varying degrees of culpability, the Commission reported that, based on its extensive research and compilation of data, "typical" child pornography cases now involve images that depict "pre-pubescent children engaging in sexually explicit conduct." *Id*. at 84.  The Commission noted that many offenders "acquire enormous and often well-organized collections," which can often run into the hundreds of thousands of images with some offenders "intentionally collect[ing] child pornography depicting sexual torture of children, including infants and toddlers." *Id.* at vii, 84-92.

In Mr. Crawford's case, his seized phone contained 490 unique files including 339 videos and 151 still images. As discussed in greater detail below, however, each video has been

determined to equate to 75 still images, thereby creating a situation where he is determined to have over 600 images which catapults his adjusted offense level by +5 pursuant to USSG § 2G2.2(B)(7)(D). Still, in comparison to the volumes of images regularly seen in such cases and reported by the Commission, this is a relatively small amount.

The Commission also discusses the widely varying level of skills possessed by the possessors of child pornography used in their acquisition of the same as well as the measures used by them to both evade detection and to help others do the same. *Id.* at viii, 61-63.  In the case at bar, Mr. Crawford used commonly available peer-to-peer and client-server networks such as Kik and Instagram. He is not alleged to have used a VPN (virtual private network) to "hide" his activity, and never made any substantial effort(s) to evade detection or to help others to do so.

According to the Child Porn Report, 25% of those charged in federal child pornography cases "received their pornography from commercial websites, thereby fostering the commercial markets", and approximately one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market." *Id.* at 98-99.  However, of particular note is that the Commission found no social science research to support the theory that criminal punishments "have affected commercial or non-commercial 'markets' in child pornography since the advent of the Internet and P2p file-sharing." *Id.* at 98.

In an observation that translates directly to the case at bar, the Commission noted in the Child Porn Report that some offenders have a "non-sexual motivation for viewing child pornography" including "avoidance of stress or dissatisfaction with life" *Id.* at 79. and that "not all child pornography offenders are pedophiles or engage in other sex offending." *Id.* at 104. Unfortunately, as noted by the Commission, "the current guideline measures for offender culpability (e.g. for distribution of child pornography, number of images possessed, possession of

sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]). *Id*. at 204.

In the Protect Act, Congress established a new mandatory minimum of five (5) years of imprisonment for existing child pornography trafficking and receipt offenses committed in violation of 18 U.S.C. §2252 and §2252(A).  (See Protect Act 2003).  In light of the new mandatory minimum penalty, the Sentencing Commission established a base offense level of 22 for those offenses, even though it produced a guideline range below the mandatory minimum for offenders in Criminal History Category I, as is the case here.  The Commission modified its general approach for this mandatory minimum penalty because experience and data showed that several existing enhancements (e.g. use of a computer, material involving children under the age of 12, number of images) were applicable in almost every case.  (U.S.S.G. App. C.), amend 665 (effective Nov. 1, 2004).  Thus, the Commission set the base offense level at 22 with knowledge that the Chapter Two Calculations would lead to a range slightly above the mandatory minimum penalty for nearly all offenders thereby maintaining a consistent approach for determining sentencing ranges.  (See *Id.*).

Again, the major flaw respecting the above-mentioned enhancements (which are set forth in U.S.S.G §2G 2.2) is not the setting of the base offense level, but that the average Defendant charts at the statutory maximum, regardless of Acceptance of Responsibility and Criminal History. The internet provides the typical means of obtaining child pornography, resulting in a two-level enhancement.  *See* U.S.S.G. §2G2.2(b)(6).  In the 2021 Federal Sentencing of Child Pornography Non-Production Offenses, the Commission found that in fiscal year 2019, over 95% of non-production child pornography offenders received enhancements for use of a computer. Furthermore, because of advancements in digital and mobile technology, defendants readily obtain

300 images with minimal effort resulting in a four-level increase. *See* U.S.S.G. §2G2.2(b)(7)(D). In the Sentencing Commission's findings, the median number of images per offender was 4,265, with some possessing and distributing millions of images and videos. Undoubtedly, as the Commission recognized, some of these images will contain material involving a prepubescent minor and/or material involving depictions of violence (which may not include "violence" per se, but simply consist of the prepubescent minor engaged in a sex act), thereby requiring a two-level increase. See U.S.S.G. §2G2.2(b)(4). However, nearly every non-production offender (99.4%) had images or videos depicting victims were prepubescent or under the age of 13 in fiscal year 2019. Furthermore, the enhancement for images depicting sadistic or masochistic conduct or abuse of an infant or toddler was applied in 84.0% of cases. Finally, because defendants generally distribute pornography in order to receive pornography in return, most defendants receive an enhancement for distribution of a thing of value. *See* U.S.S.G. §2G2.2(b)(3)(B). *See* "Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines."

In *United States v. Grober*, 595 F.Supp 382, (D. N.J. 2008), and *United States v. Hanson*, 561 F.Supp 2d 1004 (E.D. Wis. 2008), these courts discussed the complications related to the type of sentencing process involved in a possession of child pornography case. These opinions cited approvingly from "Deconstructing the Myth," regarding the flaws with §2G2.2.

The *Grober* court went on to discuss why §2G2.2 does not accomplish the sentencing goals of 18 U.S.C. §3533(a). First, §2G2.2 enhancements apply almost all the time and operate exponentially. Second, §2G2.2 enhancements promote sentencing disparity. Finally, there is a paucity of direct judicial experience to use in fashioning fair sentences. Ultimately, the *Grober* court did not apply the Guideline range the government had requested. Instead, citing the 18

U.S.C. §3553 factors and the mandatory minimum set by Congress guided the court; it imposed a 60-month sentence.

Also, in *United States v. Ontiveros*, 2008 WL 2927539 (E.D. Wis. July 24, 2008), the court cited to the reasoning in *Hanson* to support its decision to depart from an advisory Guidelines range of 97 to 121 months down to 60 months - which represented the statutory minimum. The primary impetus for doing so was the courts' recognition that the factors presented before him were "present in almost all current child pornography cases, i.e., use of a computer, number of de pictions, operated to increase the guideline range significantly above the mandatory minimum…" *Ontiveros*, 2008 WL 2937539 at 8.

These cases are reflective of the sentences federal judges routinely give to non-production child pornography offenders. In fiscal year 2019, the average sentence for non-production child pornography offenders was significantly lower than the average guideline minimum. The difference between the average guideline minimum (136 months) and average sentence imposed (103 months) was 33 months or 24.3 percent.

The view that these guidelines are unfair because the enhancements are almost always applicable is also shared by the Department of Justice. Pursuant to its obligation to annually submit to the Commission a report on the guidelines, its June 28, 2010, report included the following:

> We believe the Commission should complete its review of the sentencing guidelines applicable to child exploitation crimes and prepare a report to Congress that might include recommendations for reforming the current child exploitation guidelines. The goal of any such reform would be update the guidelines to address changing technology and realities surrounding these offenses, improve the consistency of sentences across child exploitation crimes, and ensure that the sentences for certain child exploitation offenses adequately reflect the seriousness of the crimes.
>
> We think the report to Congress ought to recommend legislation that permits the Sentencing Commission to revise the sentencing guidelines for child pornography offenses and that suggests that any revised guidelines might look

like.  Over the last two decades, Congress has directed the Sentencing Commission to amend the guidelines for child pornography offenses on a number of occasions.  *See Treasury, Postal Service, and General Government Appropriations Act of 1992*, Pub.L.102-141, Section 632, October 28, 1991, 105 Stat. 876;  *Sex Crimes  Against Children Prevention Act of 1995*, Pub. L. 104-71, December 23,1995, 109 Stat. 774;  *Prosecutorial Remedies and Tools Against the  Exploitation of Children Today Act of 2003* (the PROTECT Act), Pub. L. 108-21, section 401, April 30, 2003, 117 Stat. 672-73.  Collectively in these bills, Congress directed the Sentencing Commission to increase the base offense level and to add certain enhancements, including enhancements for the use of a computer in the commission of the crime and for the number of images involved in the crime.

We believe changes in the use of technology and in the way these crimes are regularly carried out today suggest that the time is ripe for evaluating the current guidelines and considering whether reforms are warranted. Consideration ought to be given to updating many aspects of the child pornography sentencing guidelines to better calibrate the severity and culpability of defendants criminal conduct with the applicable guideline sentencing ranges.  Because the current guidelines are largely mandated by statute, though, legislation will be required to modify them.

## III. Requested Sentence

Mr. Crawford is aware of the guidelines range calculated in his Presentence Report.  Mr. Crawford pled guilty to one (1) count of receipt or distribution of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. § 2252(a)(2); and one (1) count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).  Pursuant to 18 USSG §2G2.2(a)(2), his base offense level is 22.  As stated above, the Specific Offense Characteristics in §2G2.2 should not apply in Mr. Crawford's case because they are completely inadequate in distinguishing culpability among offenders because they apply in nearly every single child pornography case.  Mr. Crawford's base offense level of 22 is decreased by 3 levels total because Mr. Crawford clearly demonstrated acceptance of responsibility for the offense and because he assisted the authorities in the investigation or prosecution of his own misconduct by cooperating in their investigation into his own charges and timely notifying the authorities of his intention to

enter a plea of guilty.  Therefore, Mr. Crawford is left with a total offense level of 19.  With no prior criminal offenses to adjust for, Mr. Crawford's Criminal History Category is I.

The maximum term of imprisonment in this case is 20 years.  As noted above, Mr. Crawford's total offense level is 19 and his Criminal History Category is I, therefore, his guideline imprisonment is 30 months to 37 months.  Moreover, Mr. Crawford is subject to the statutory minimum mandatory sentence of 60 months pursuant to 18 U.S.C. § 2252(a)(2).  According to U.S. Sentencing Commission's online sentencing data resource, during the past 5 years (2019-2023) there were 80 Federal offenders whose primary guideline was §2G2.2, with a final offense level was 19 and a Criminal History Category of I.  The average length of imprisonment was 54 month(s) and the median length of imprisonment imposed was 60 month(s).  While 18 U.S.C. § 3553(a)(6) advises that the Court should avoid unwarranted sentencing disparities between defendants with the same offense score and criminal history category, Mr. Crawford may not receive a sentence of less than 60 months.  That said, upon consideration of the average length of imprisonment for defendants similarly situated to Mr. Crawford as well as the case law, legislative history, and information provided in Federal Sentencing Commission's Reports discussed through this Sentencing Memorandum, Mr. Crawford respectfully requests that this Honorable Court impose a sentence of Sixty (60) months.  The requested sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

Mr. Crawford's offense is less serious than the offenses Congress had in mind, and he is not the dangerous offender Congress had in mind, when it required severe penalties (which are governed in large part by guidelines enhancements) in child pornography cases.

## IV.    Argument in Light of Legislative History

In enacting the Sentencing Reform Act, Congress did "not favor one purpose of sentencing

over another," except that rehabilitation was not to be a reason to impose a sentence of incarceration. See S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case than another purpose has." *Id.* at 68. In choosing what kind of sentence to impose, the court "must consider" all of the purposes and factors set forth in § 3553(a). *Id.* at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." *Id.* see also *United States v. Bridgewater*, 479 F.3d 439, 442 (6th Cir. 2007) ("often one or two [purposes] prevail, while others pale").

Here, each of the purposes of sentencing point in the same direction. Mr. Crawford's offense is less serious than the offenses Congress had in mind, and he is not the dangerous offender Congress envisioned when enacting the guidelines.

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters.[1] Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers. Aside from the lack of evidence to support this belief in general, *see* Child Porn Report at 104 (confirming that "not all child pornography offenders are pedophiles or engage in other sex offending"), Mr. Crawford has not been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at no risk of harming a child. This distinguishes Mr. Crawford from the offenders Congress had in mind and is, therefore, highly relevant. See *United States v. Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) (rejecting presumption that "those who

---

[1] See 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of directing increase to base offense level from 10 to 13); id. at H6736, H6738 (Sept. 24, 1991) (Rep. Wolf)) (same); 141 Cong. Rec. S5509 (Apr. 6, 1995) (Sen. Grassley) (in support of directing additional increase in base offense level from 13 to 15); 144 Cong. Rec. S12262 (Oct. 9, 1998) (Sen. Hatch) (in support of directing expanded reach of "distribution" enhancement); 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch) (In support of Feeney Amendment, which included number-of-images enhancement)

view child pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that viewing child pornography does not equate to child molestation"); *United States v. Kelly*, 868 F. Supp 2d 1292, 107-08 (D.N.M. 2012) (rejecting the government's argument that guideline range is appropriate because of the "chance that [a defendant] will molest children in the future, or he has in the past," as the defendant "has never been accused of hands-on abuse," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "any Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence") *United States v. Cruikshank*, 667 F. Supp. 2d 697, 703 (S.D. W. Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers"); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n. 10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a reliable basis."); *United States v. Grober*, 595 F. Supp. 2d 382, 404 (D.N.J. 2008) ("[T]he Court cannot make [a Defendant] a surrogate for the monsters who prey on child victims through actual contact.") aff'd 624 F.3d 592 (3d Cr. 2010).  The Commission confirms that the possession of even large numbers of images, including sado-masochistic images, is "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." Child Porn Report at 204.

Furthermore, technology has changed the nature of this offense.  In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money, whereas today, images of child pornography are available for free in the privacy of one's home, with no planning and minimal effort with the use of a computer and internet.  As a result, less dangerous people commit this offense than was previously the case, even though the guideline

range is much higher than it was previously.  Before widespread dissemination on the Internet, only those bold enough to seek out child pornography by contacting suppliers directly or through the mail were able to obtain it.  In 1994 and 1995, the government prosecuted a total of only 90 defendants convicted of possessing, receiving, or distributing child pornography, and only 24% used a computer. See U.S. Sent'g Comm'n Report to the Congress: Sex Crimes Against Children 29 (1996).  In 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer.  U.S. Sent'g Comm'n, Use of Guidelines and Specific Offense Characteristics (2011).

The Internet, by rendering child pornography immediately and anonymously accessible, has facilitate[d] … a new kind of crime" that in most cases would not otherwise have been committed.  *See* Andrea Frei et al., Pedophilia on the Internet – A Study of 33 Convicted Offenders in the Canton of Lucerne, 135 Swiss Med. Weekly 488, 492 (2005).  In short, the change in technology is relevant, in part, because it means that, even as the population of child pornography has become less dangerous, punishment has greatly increased. *See* Richard Wollert PhD, the Implication of Recidivism Research and Clinical Experience For Assessing and Treating Federal Child Pornography Offenders: Written Testimony Presented to the U.S. Sentencing Commission at 4-5 (Feb. 15, 2012).

In determining an appropriate sentence, this Court must consider the sentences available by statute. *See* 18 U.S.C. § 3553(a)(3).  Congress set the statutory range of imprisonment for Mr. Crawford's offense at five to twenty years and authorized term of probation. *See* 18 U.S.C. § 2252A(a)(2).  Mr. Crawford's guidelines in the Presentence Report are significantly enhanced as a result of his Specific Offense Characteristics.  As many courts have observed, the child pornography guidelines, by enhancing sentences based upon factors that are inherent in the crime

and thus appear in nearly every case, concentrates offenders at or near the statutory maximum and thus fails to meaningfully distinguish more serious offenders from less offenders.[2]  Sentences at or near the statutory maximum should be reserved for the "worst possible variation of the crime" committed by the most dangerous offender. See *United States v. Aleo*, 681 F.3d 290, 302 (6th Cir. 2012); cf. *United States v. Poynter*, 495 F.3d 349, 354 (6th Cir. 2007).

Some courts have cited examples of factors that, in general, might justify the imposition of a sentence at or approaching the statutory maximum.  Some of these factors include failing to accept responsibility, using violence, or having prior convictions for sex offenses with children. See *Aleo*, 681 F.3d at 302; *Poynter*, 495 F.3d at 354.  None of those factors apply in Mr. Crawford's case.  Indeed, even in a pre-Child Porn Report case, wherein a high school teacher paid a female student to take pictures of herself in the nude and provide them for his personal collection, the United States Court of Appeals, Fourth Circuit, found that the lower court's 36-month downward departure from the Defendant's guidelines was not an abuse of discretion and affirmed the sentence imposed. *United States v. Pauley*, 511 F. 3d 468 (4th Cir. 2007).  In the case at bar, Mr. Crawford is requesting the statutory minimum sentence which is higher 6 months higher than the applicable minimum guideline range and equal to the applicable maximum guideline range.

Mr. Crawford's conduct and characteristics could not be farther from any of the possible justifications for imposing a sentence at or above the high end of the Guidelines range calculated and contained in the Presentence Report.  He has never improperly touched a child, he has had no contact with any of the minor victims, he never approached a child to purchase pornography, he was not a "caretaker" or "custodian" of any child depicted in the pornography seized by the government and has fully accepted responsibility for his offense.  All of the aforementioned being

---

[2] *See, e.g., United States v. Durham*, 618 F.3d 921, 931 (8th Cir. 2010); *United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010); *United States v. Kelly*, 868 F. Supp. 2d at 1208-09.

said, Mr. Crawford recognizes the great harm inflicted on the victims depicted in the images found on his computer and has taken ownership of his behavior in viewing them. Furthermore, Mr. Crawford has agreed to undergo, and has already engaged in mental health and substance abuse treatment which could help him resolve some of his issues and prevent him from recidivating when he is subsequently released prison.

## V. Collateral Consequences

As this Court is aware, in addition to any sentence of incarceration/supervised release meted out in this matter, Mr. Crawford will be required to register as a sex offender, with the publication of that information to the community. He will face the challenging prospect of finding a job after being labelled as a "sex offender." As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. See, e.g., *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of Gall, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after Gall, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)''s directive that the sentence reflect the need for just punishment" and "adequate deterrence"; *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming a below-guideline sentence based in part on the court's findings that the defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis," which requires sentences to

reflect, among other things, "the history and characteristics of the defendant," and the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence").

## VI.     The need for adequate deterrence 18 U.S.C. § 3553(a)(2)(B)

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch et al., Criminal Deterrence and Sentence Severity: An Analysis of Recent Research (1999) (concluding that "correlations between sentence severity and crime rates… were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of the sentences generally is capable of enhancing deterrent effects") m9; Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects… Three National Academy of Science panels, all appointed by Republican presidents reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level… While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 15 (2004). See also, infra.  And according to "the best available evidence…prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S (2011).

Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventative effect on the production or dissemination of child pornography.  As explained further infra, this is in part because the production and dissemination are a widespread, international problem.  There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp.2d at 1103; *Id.* at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of.").  The Commission acknowledges that there is no social science research supporting the theory that criminal punishments "have affected commercial or no-commercial 'markets' since the advent of the Internet and P2P file-sharing." Child Porn Report at 98.

## VII.    Need for Incapacitation 18 U.S.C. § 3553(a)(2)(C)

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children. *See* n.2 *supra.*  This belief is contrary to the empirical research in general and is unjustified based on

18

the evidence in this case.

Current empirical research demonstrates that "first-time child pornography possession only offenders appear to be very low risk of sexual recidivism [of any kind], in contrast to those with any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography)," Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sent'g. Comm'n at 4 (Feb. 15, 2012), and "online offenders who had no history of contact offenses almost never committed contact sexual offenses." Seto et. al., Contact Sexual Offending by Men With Online Sexual Offenses, 23 Sexual Abuse 124, 137 (2011); see also Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g Comm'n, at 14-17, 21-22 (Feb. 15, 2012) (reporting that in his study of 72 federal child pornography offenders under supervision, including three production offenders, with varying criminal histories, two were arrested for possessing child pornography and none were arrested for a contact offense within four years); Helen Wakeling et. al., Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders, 23 Sexual Abuse: J. Res & Treatment 146, 164 (2011) (child pornography offenders "do not as a group present a significant risk of escalation of contact sexual offenses."); Jerome Endrass et. al., The Consumption of Internet Child Pornography and Violent Sex Offending, 9BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that "the consumption of child pornography alone does not seem to represent a risk for committing hands-on sex offenses"); Seto & Angela W. Eke, The Criminal Histories and Later Offending of Child Pornography Offenders, 17 Sexual Abuse 201, 207-08 & tbl. 111 (2005) (finding that 1.3% of those who had committed

19

child pornography offending only recidivated with contact sex offenses; "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children."); L. Webb et. al., Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters, 19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far[,] the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism").  As one district court put it, "the empirical literature [] generally concludes that there is little — if any — evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses." *Marshall*, 870 F. Supp.2d at 492.

The Commission's research demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism, see U.S. Sent'g Comm, Measuring Recidivism at 12-13 & Ex: 10; U.S. Sent'g Comm'n, Recidivism and the "First Offender" 8 (2004), as does substantial other research.[3]  For sex offenders, cognitive behavioral therapy substantially reduces recidivism. U.S. Dep't of Justice, Center for Sex Offender Management, Understanding Treatment for Adults and Juveniles Who Have Committed Sex Offenses 10 (2006).  As the Commission reports, recent studies show that "appropriate 'treatment interventions are associated with lower rates of recidivism — some of them very significant'" Child Porn Report at 278 & n.31 (citing a project funded by the Department of Justice).

Mr. Crawford's education, employment history, acceptance of responsibility, sincere remorse and lack of criminal history strongly support the conclusion that he is highly unlikely to

---

[3] See Miles d. Harer, Federal Burea of Prisons, Office of Research and Evaluation, Recidivism Among Federal Prisoners Released in 1987, at 5-6, 54 (1994), Robert J. Sampson & John H. Laub, Crime and Deviance Over Life Course: The Salience of Adult Social Bonds, 55 Am. Soc. Rev. 609 (1990)

re-offend.  While a small minority of defendants convicted of possessing/receiving child pornography may again view child pornography and an even smaller minority may molest children, Mr. Crawford is not one of them.  Mr. Crawford's sentence should reflect the fact that Congress's contrary assumption is unfounded in this case.  The evidence indicates that Mr. Crawford will never view child pornography again. He has refrained without exception from any such activity while on a substantial period of pretrial release in this matter indicating his ability to cease such behavior and abide by and such conditions imposed. Supervised release with appropriate conditions is more sufficient to ensure that he never does.  As discussed above, the guideline calculation gives heavy weight to factors based on assumptions about the seriousness of the offense and general deterrence that are unfounded in general and particularly in this case.

The Court must also weigh sentencing practices in other courts against the § 3553(a) factors in this case and any unwarranted disparity created by the guideline itself. *Kimbrough*, 552 U.S. at 108.  The data shows that a sentence of Sixty (60) months in custody, registration as a sex offender, and some period of supervised release would not create unwarranted disparity.

The number of images chosen by Congress in its table is arbitrary, and so low that "the majority of defendants receive the highest possible enhancement." *Kelly*, 868 F. Supp. 2d at 1209. With the internet and programs like Kik or Snapchat "it takes only marginally more effort to collect 10,000 images than it does to collect ten." Stabenow, A Method/or Careful Study, at 124.  The Sentencing Commission has now acknowledged that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography," Child Porn Report at 6, and that, as the result, the current enhancement for number of images "does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," and is overly severe for some offenders. *Id*. at 323.  It also recommends that the enhancement be

updated to account for "the number of unique, as opposed to duplicate, images possessed by an offender." Id.  And, as with the enhancement for the nature of the images, the Commission confirms that the enhancement for number of images possessed is "generally not associated with significantly higher rates of [criminally sexually dangerous behavior]." Id. at 204.  Mr. Crawford has received a five (5) point enhancement which applies to nearly every possessor/receiver of child pornography, but which ultimately has a diminished effect on his sentence as he is subject to a minimum mandatory sentence of five (5) years.

In initially criminalizing the possession of child pornography, Congress acted on the view that those "who possess and view" child pornography represents the "market" for the production of child pornography, and that punishing child pornography possessors (and thereby receivers) will dry up the market and thereby reduce demand for the abuse of children in order to produce child pornography. 136 Cong. Rec. S4730 (Apr. 20, 1990) (Sen. Thurmond).  It relied on this same view when it directed the Commission to increase the base offense level in 1991. See 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) ("[W]e must increase the sentencing levels for child porn if we want to stop child molestations and put a dent inside the child porn trade.")[4]  And when it directed the Commission to add the 2-level enhancement for use of a computer, Congress was concerned with deterring the online distribution and trade of child pornography. 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Hatch) (purpose was to "increase penalties for the use of computers in connection with the distribution of child pornography," in part to "ensure that [the information super] highway is not littered with the debris of child pornography"); see also Id. (Senator

---

[4] The Sixth Circuit has also indirectly relied on this view when it found "inexplicable" a district court's assessment that a higher sentence in a very similar case will not advance the goal of general deterrence. *See Bistline*, 665 F.3d at 767 (citing *United States v, Camiscione*, 591 F.3d 823 (6ᵗʰ Cir. 2010), which in turn relied on the Seventh Circuit's view that "[t]he logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced").

Grassley) (the purpose was to "discourage child pornographers from using computers to trade in child pornography").

But Congress was mistaken.  The production, trading, and viewing of child pornography takes place in a global market that cannot be significantly impacted by severe penalties in the United States.  Many countries do not have laws aimed at child pornography, and of those that do, many do not criminalize the possession of child pornography. John Carr, Commonwealth Internet Governance Forum, A Joint Report on Online Child Protection Combatting Child Pornography on the Internet 19 (2010).  As a result, there is a large, international legal market for child pornography that exists whether Mr. Crawford is incarcerated for one day or twenty years.  This market is not organized but is mostly comprised of amateur collectors who can freely and easily obtain images, increasingly via peer-to-peer networks, *see* United Nations Office on Drugs and Crime, the Globalization of Crime: A Transnational Organizes Crime Threat Assessment 13 (2010) ["UNDOC, Globalization of Crime"], and thus does not operate by the ordinary rules of supply and demand.  In this context, severe punishment of a marginal consumer can have little impact on the proliferation of child pornography on the Internet.  The Sentencing Commission acknowledges that there is no social science research to support the theory that criminal punishment affects the child pornography markets since the advent of the Internet and file sharing programs.  Child Porn Report at 98.

Moreover, while Congress was concerned that computers would make it easy for dangerous offenders to disseminate and trade images, it did not tailor the computer enhancement to meet that concern.  Instead, it required the Commission increase penalties for those who are not dangerous and who did not use the computer in ways Congress imagined.  The Commission has recognized that the enhancement sweeps too broadly and indicated that the use of a computer might

23

appropriately be considered an aggravating factor only when it was used to widely disseminate child pornography or to make it accessible to children. *See* U.S. Sent'g Comm'n, 1996 Report, at 28-30 & n.23; see also *Dorvee*, 616 F.3d at 95 (recognizing the Commission's criticism); *Phinney*, 599 F. Supp. 2d at 1042 ("[S]ome computer users are more harmful than others, yet the enhancement provided no distinction."). Here, while Mr. Crawford used his phone to disseminate images, he did not use his phone to make images accessible to children. He is not the offender Congress had in mind.

Most important, there is no empirical evidence to support the assumption that children are abused for the sole or primary purpose of creating child pornography for dissemination. UNDOC, Globalization of Crime at 214 ("[I]n most cases, the images are generated as a result of the abuse, rather than the abuse being perpetrated for the purpose of selling images."); *see* also Janis Wolak et al., Arrests for Child Pornography Production: Data at Two Time Points from a National Sample of U.S. Law Enforcement Agencies, 16 Child Maltreatment 184, 192-93 (2011) (The data "suggest that online distribution often was not a motivation for [child pornography] production."). Even Congress has since recognized that "the production of child pornography is a byproduct of, and not the primary reason for, the sexual abuse of children." Pub. L. No. 108-21, § 501 (2003).

Accordingly, several courts have found that there is evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F. Supp. 2d at 1103; *Id.* at 1103-04 (noting that while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."); *United States v. Stern*, 590 F. Supp. 2d 945, 952 n.5 (N.D. Ohio 2008) ("The Court is… forced to note the somewhat limited impact of domestic prosecution for a fundamentally international crime… [N]o court

should be deluded into believing that limiting domestic consumption alone can eradicate the international market for child pornography."); *Kelly*, 2012 WL 2347084 at *5 ("The Court is aware of absolutely no evidence suggesting that increased penalties for the consumers of child pornography have decreased the swell of child pornography produced or posted to the internet or deterred 'hands-on' abuses against children.   To the contrary, while prosecutions of child pornography have skyrocketed, prosecutions of actual sexual abuse of children have remained constant.").   They recognize that possessing even large numbers of images does not affect the market. *Id.* at *7 ("[T]he tragic realities are such that downloading 500 widely available images has virtually no effect on the market.   Sadly, the worldwide market for child pornography is so vast that the relative impact of several hundred additional images is miniscule yet results in a significant increase in the guideline range.") (Internal quotation and citation omitted); *United States v. Raby*, 2009 WL 5173964, at **6-7 (S.D. W. Va. Dec. 30, 2009) ("the worldwide market for child pornography is so vast that the relative impact of having even 592 additional images is miniscule.").

Congress has also apparently relied on the view that severe penalties will deter others from possessing child pornography.   In support of criminalizing the possession of child pornography, Senator Thurmond stated that "tough penalties… will be a deterrent to those who would sexually exploit children." 136 Cong. Rec. S9029 (June 28, 1990).   The Sixth Circuit, referring to Congress's actions over the years regarding child pornography offenses, said it is "clear" that Congress was interested in "deterrence" whenever it acted to increase the guideline range. *Bistline*, 665 F.3d at 764.   But to the extent that Congress believed that increasing penalties would deter others from possessing child pornography, it was mistaken.   As shown, supra, empirical research is unanimous that more severe sentences do not decrease the likelihood that others will commit

crimes.

To the extent that Congress meant to deter child pornography possessors themselves from committing further crimes, all of the empirical research is in agreement that imprisonment does not reduce recidivism. See, e.g. Tina L. Freiburger & Brian M.Iannacchione, An Examination of the Effect of Imprisonment on Recidivism, 24 Crim. Just. Stud. 369, 377 (2011) ("The results indicate that incarceration did not affect either offenders' likelihood of recidivating or the severity of recidivism."); Howard E. Barbaree et al., Canadian Psychological Association Submission to the Senate Standing Senate Committee on Legal and Constitutional Affairs 6 (Jan. 2012) ("Psychology researchers have identified effective methods, or 'what works,' to reduce crime — the overwhelming consensus of the literature is that treatment works, incarceration does not.").[5] As Judge Roger Warren, President Emeritus of the National Center for State Courts, stated in 2007: "The research evidence is unequivocal that incarceration does not reduce offender recidivism." Roger Warren, National Center for State Courts, Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries 11 (2007).[6]  Instead, "[i]ncarceration actually results in slightly increased rates of offender recidivism." Id.[7]  In other words, "across the offender population, imprisonment does not have special powers in persuading the wayward to go straight.  To the extent that prisons are used because of the belief that they reduce reoffending more than other penalty options, then this policy is unjustified." Francis T. Cullen et al., Prisons Do Not Reduce

---

[5] Available at
http://www.cpa.ca/docs/file/Government%20Relations/SenateCommitteeSubmission_January302012.pdf.
[6] Available at http://nicic.gov/library/files/023358.pdf.
[7] See also Mark W. Lipsey and Francis T. Cullen, The Effectiveness of Correctional Rehabilitation: A Review of Systematic Reviews, 3 Ann. Rev. L. Soc. Sci. 297, 302 (2007) ("[R]esearch does not show that the aversive experience of receiving correctional sanctions greatly inhibits subsequent criminal behavior. Moreover, a significant portion of the evidence points in the opposite direction – such sanctions may increase the likelihood of recidivism. The theory of specific deterrence inherent in the politically popular and intuitively appealing view that harsher treatment of offenders dissuades them further from criminal behavior is thus not consistent with the preponderance of available evidence."

Recidivism: The High Cost of Ignoring Science, 91 Prison J. 48S, 50S-51S (2011) ("[H]aving pulled together the best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions."). As for why this is the case, the Commission and scholars have identified numerous "criminogenic" effects of incarceration, including that prison serves as a school for criminals; severs ties to family and community; diminishes employment options upon release; and reduces rather than increases the inmate's willingness or ability to conform to social norms.[8]

Instead, treatment works.  The Commission reports that recent studies show that "appropriate 'treatment interventions… are associated with lower rates of recidivism some of them are very significant,'" Child Porn Report at 278 & n.31 (quoting Center of Sex Offender Management, The Comprehensive Approach to Sex Offender Management 5 (2008).

In sum, each of Congress's actions rested on unfounded assumptions.  As the Commission has noted, congressional directives "creat[e] anomalies in the guidelines structure" and "new sentencing disparities," and "are potentially in tension with the fundamental Sentencing Reform Act objectives of delegating to an independent, expert body in the judicial branch of the government the finer details of formulating sentencing policy and revising that policy in light of actual court sentencing over time." U.S. Sent'g Comm'n Mandatory Minimum Penalties in the Federal Criminal Justice System 122-23 (1991).  Yet, as shown next, the relevant amendments promulgated by the Commission by its own choice were also without empirical support.

In 2004, the Commission decided to count "[e]ach photograph, picture, computer, or

---

[8] See generally Martin H. Pritiken, Is Prison Increasing crime, 2008 Wis. L. Rev. 1049, 1054-72 (cataloging eighteen criminogenic effects of incarceration); Lynne M. Vieraitis, Tomaslav V. Kovandzic, & Thomas B. Marvel, the Crimogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002, 6 Criminology & Pub. Pol'y 589, 614-16 (2007); see also U.S. Sent'g Comm'n, Staff Discussion Paper, Sentencing Options Under the Guidelines 19 (1996) (recognizing imprisonment has criminogenic effects, including contact with more serious offenders, disruption of legal employment, and weakening of family ties).

computer-generated image, or any similar visual depiction [as] one image." USSG, App. C, amend. 664 (Nov. 1, 2004); USSG § 2G.2.2 cmt (n.4(B)(ii)).  It further instructed that each "video, video-clip, movie, or similar recording shall be considered to have 75 images." *Id.*  The Commission did not provide any reason for this change.  It later explained that the Department of Justice had proposed subjecting each video to a 2- or 3-level enhancement, that it had accepted that position, and it counted each video as 75 images so that a single video would receive a 2-level enhancement under Congress's number-of-images table. *See* U.S. Sent'g Comm'n, History at 43-44 (explaining that it selected 75 images because it is "squarely in the middle of the 2-level increase range").  In other words, the Commission's choice to use 75 images for each video was not based on empirical evidence, instead it was based on the Department of Justice's request and Congress's number-of-images table, which itself was adopted without explanation of justification.  The Commission provided no evidence that persons who possess videos as opposed to still images are more culpable or present a greater risk of harm.

Enhancements that apply in nearly every case do not serve their purpose.  The enhancements for material involving use of a computer, and number of images apply in nearly every case sentenced under § 2G2.2.  In fiscal year 2011, 97.4% received the 2-level enhancement for use of a computer; and 96% received at least a 2-level enhancement based on the number of images, with most (70.9%) receiving the 5-level enhancement for 600 images or more.  These circumstances thus describe conduct that is "essentially inherent to the crime itself," not aggravating factors describing a more serious offense or higher risk of harm. *Kelly*, 868 F. Supp. 2d at 1208-09.  In *United States v. Robinson*, the Sixth Circuit acknowledged that enhancements that apply "in almost every case are contrary to the purpose of the enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense." 699 F.3d 767,

778 (6th Cir. 2011) (also discussing the enhancement for "use of a computer").  Such enhancements render § 2G2.2 an "anomaly." *Id.*

The Sentencing Commission confirms that "sentencing enhancements that originally were intended to provide additional punishment for aggravating conduct now routinely apply to the vast majority of offenders," Child Porn Report at xi, such that the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *Id.* at 323.  Because the enhancements for computer use and type of volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at ii, xi, 209, 323.

The only guideline based, in part, on the Commission's "characteristic institutional role," and thus arguably sound, is the original guideline promulgated by the Commission in 1991.  That guideline reflected the Commission's analysis of empirical data and national experience suggesting that judges believed that § 2G2.2 was already too severe in non-distribution cases, as evidence by a 38% rate of downward departure. *See* 137 Cong. Rec. H6737 (Sept. 21, 1991).  The Commission expressed concern that raising penalties even higher "may aggravate this below guideline rate and heighten sentencing disparity." *Id.*

As of 2012, below-guideline sentences were imposed in 65.6% of cases sentenced under § 2G2.2, which includes hundreds of downward variances under § 3553(a) sponsored by the government. *See* U.S. Sent'g Comm'n, 2011 Sourcebook of Federal Sentencing Statistics, tbl.28.  While most judges do not follow § 2G2.2, others do, resulting in unwarranted sentencing disparity.

## CONCLUSION

Based upon the foregoing, Defendant believes that the statutory mandatory minimum sentence of sixty (60) months is sufficient, but not greater than necessary to comply with the

purposes of sentencing.  The offense characteristics which apply to Mr. Crawford apply in almost every child pornography case and these enhancements are becoming increasingly disfavored by the Sentencing Commission, the Department of Justice, and many federal judges.  Based on the characteristics and history of Mr. Crawford, the downward variance to the statutory mandatory minimum of sixty (60) months is substantively reasonable and would fulfill the purposes and principles of sentencing.

Respectfully Submitted,

/s/Seneca Konturas
Seneca Konturas (Ohio Bar#0095328)
PO Box 13358
Fairlawn, Ohio 44334
Tel. (330)552-7117
Fax (330)382-3052
Email: seneca@sk.legal
*Attorney for Defendant*

# EXHIBIT A

LETTERS OF SUPPORT

10/19/24

I have been writing this letter in my head, hoping I'd never actually have to do it. It breaks my heart to have to do it now. I am a 44 years old wife, mother of 3 and grandmother of one.

I've known Brandon since I've been working at the Eye Open over eleven years ago. I knew him first as the little brother of Ashley Crawford. She was a co-worker and he would sometimes come in with her. I later heard the stories of how he and Ashley would be left on their own when he was just a kid and she was a teenager. I'm a Parent and I believe those are the years kids need a mom and dad the most.

I've gotten to know Brandon better since he's been working at the Eye Opener.

As a co-worker, I find Brandon to be smart, kind and dependable. He is the person I go to in the kitchen when I miss up because he doesn't judge me. But, in the last year or so I call him my friend. Odd, right? A 44 year old grandmother and a young adult! But I feel Brandon is an old soul. He is funny, loyal and would do anything for you. We set together and talk about life, sports and every thing in between.

I believe Brandon Crawford deserves a second chance. He has so much to give our community, that could benefit our community. People make mistakes—but if they learn from them and try to do better, I believe they should get another chance.

Thank you.

Sincerely,
Susan Allhead

Hello,

My name is Steve Arn and I am writing this letter on behalf of Brandon Crawford. Let me start by saying that I, along with my ex wife Elizabeth Keener have owned several local businesses for the past 35 years. In that time we have had the opportunity of hiring many young men and women. We do so more by judging their character than anything else. Elizabeth hired Brandon at her restaurant, The Eye Opener and since his arrest hes welcomed him into her home. I have in the past several months had a chance to get to know this young man. In this time, I have found him to be a very sincere and honest individual.

I believe we all have made mistakes that we regret, but it's what we learn from those mistakes that counts. I don't take lightly the position that he's put himself in, but I feel very strongly of his remorse and the shame he feels. I understand what he did was wrong and he should pay for his actions, but you have the power to maybe decide his future. I know he made a bad decision but I believe that he is not a bad person. I hope you take this letter into consideration in regards to this young mans life.

Sincerely,

SLWA

December 18, 2024

The Honorable David Ruiz,

In mid March of 2024 Brandon Crawford came to me and asked for help. I own a restaurant and Brandon works with me. I am not unaccustomed to employees needing help but my conversation with Brandon that day was unexpected to say the least. I have known Brandon since he was around ten years old because his older sister worked for me at sixteen on weekends washing dishes. Had I known at the time the reason she needed a job, I would have intervened. But I did not know that their mother left them on their own for weeks at a time and Ashley needed money for food. She has since told me that she never said anything because she was afraid of being separated from her brother. Brandon started to work for me after pandemic times. He is an exemplary employee. He is loved by all his co workers and for good reason. He is a light in an often dreary business. He is kind and generous to everyone and has a sense of humor that never misses and brightens everyone's day. I went to court with Brandon on March 21st and knowing that he had told me that his he was living with his mother and that he had to give her his entire paycheck to live in the unfinished basement, I realized that he would have no way to pay for an attorney. So the Court allowed Brandon to live at my house with my husband Peter Ellis and me. Since that time, Brandon and I have spent many hours on the patio, in the family room, having some hard conversations. I have a daughter. And I say this for two reasons. Victimization of anyone is abhorrent. I can only think of my daughter when knowing that there are people victimizing young people in such an horrific way. Secondly, my 27 year old daughter has, in the past, done some incredibly stupid things. In my youth I did incredibly stupid things. When young "adults" do stupid things, science now understands that their brains are not fully formed. They may think their brains are fully formed, the armed services may think their brains are fully formed, but real science says otherwise. During our long talks Brandon and I had a conversation about revictimization. This was a concept that I assure you had not occurred to him. That was the first night that he cried in my arms. Sobbing tears. It is getting close to a year now that Brandon has lived with us. I can tell you that there is not a bone in my body that would think that Brandon would willingly hurt another person. Ever. I have googled until my fingers are blue trying to see if there is a way that he can be helped by the legal system. It seems as if it is all up to you. So I implore you to read all the letters, to get to know Brandon, to consider that he was young and stupid and not thinking. I thank you for your time and thoughtful consideration.

Sincerely,

Liz Keener

My name is Ashley Crawford,
Brandon is my only sibling.
Our childhood growing up was
basically me raising him, our
parents were not around much.
Our father was extremely ill with
Epilepsy, had surgery, lost his short
term memory and was extremely
verbally abusive. Our mother decided
to stay away from the home
and neglect the both of us. My dad
moved away. Even with very slim
if any parental guidence, you can
ask anyone that has come in contact
with Brandon and they will all say
the same thing, kind caring, gentleman,
puts others first, Empathetic, funny, and
hard working. He would even help with
people who had special needs and
coach the football team. My brother
has been exposed to a tremendous
amount of trauma, hurt, greif, and pain
starting at a very young age. I would
always look at him and tell him
We would make it and everything would
be okay. This has proven true every...

time but unfoturately this is the
first time I have said those words
to him and I'm not so confident.
Brandon is all I ever had. No one
will ever understand what we have
gone through but us. I can't imagine
a day going by that I can't see
him or talk to him. This situation
is so devistating because I know in
my heart and soul my brother
means well in this world. He lost a
childhood and was thrown into
adulthood will absolutly zero guidance
and now he is in a situation
where he could lose even more
time of his life. I know whoever is
reading this doesn't know him at
all, but if you could please hear my
plead of grace. I don't want to lose
him I love him like no other. He
means well in this one life we have.
Thank you for reading.

— Ashley Crawford

Leah Crawford-Cain

Hello, My name is Leah I am 10 years old and I'm Brandon's neice. he has Been the best Uncle in the Whole world. I am not quiet sure what is going on But I don't Really Care, as long as he's safe I don't Really mind. I can't emagin What life would Be like without him, he has taught me so much he's almost like a teacher. But he is the Bestest Uncle Person is this world And I Love him!

Love-
Leah Crawford-
Cain